UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>PAYROLL AMERICA, INC., dba<br>Payroll Associates,<br><br>                Debtors. | Case No. 1:13-cv-00044-BLW<br><br>**MEMORANDUM DECISION** |
| JEREMY GUGINO,<br><br>                Appellant,<br><br>    v.<br><br>GREATER ROME BANK, a Georgia<br>Financial Institution,<br><br>                Appellee. | |

**INTRODUCTION**

The Chapter 7 bankruptcy trustee appeals from the bankruptcy court's decision granting summary judgment in favor of defendant Greater Rome Bank. For the reasons explained below, the Court will affirm.

## BACKGROUND

### 1.    The Parties

Payroll America, Inc. was a local payroll processing company.  It collected money from its clients, typically employers, and used that money to pay its clients' employees and taxing authorities.  At some point before this litigation, Payroll America misappropriated monies that had been impounded to pay its clients' future tax bills.[1]

In March 2010, Payroll America filed a Chapter 7 bankruptcy petition.  Shortly afterward, the Chapter 7 trustee sued Greater Rome Bank.  The trustee contends that Payroll America fraudulently transferred over $30 million to Greater Rome Bank before filing for bankruptcy.  The trustee seeks to recover those monies for the estate.

Payroll America is not one of Greater Rome Bank's clients.  The other defendant in this action – Data Processing Service (DPS) – banked with Greater Rome Bank. Payroll America hired DPS to help process electronic transmissions through the Automated Clearing House (ACH) Network.  To understand the claims in this action, it is necessary to understand how these ACH transactions work.

---

[1] For purpose of its summary judgment motion, Greater Rome Bank assumed Payroll America misappropriated funds at some point before October 2008 and therefore could not pay some of its customers' tax obligations in June 2009 despite having withdrawn funds from these customers' accounts.  *See Greater Rome Bank's Mot. Memo.*, Bankr. Dkt. 103, at 2 n.1. Throughout this decision, citations to the "Bankr. Dkt." refer to the Bankruptcy Court's docket in *Gugino v. Duke (In re Payroll Am., Inc.)*, Case No. BK-10-0800-JDP (Bankr. D. Idaho).

2.    **ACH Transactions**[2]

An automated clearing house is a data hub for financial transactions.  The main participants in ACH transactions are originators and receivers.  Originators include individuals and others who want to transfer money out of their bank accounts.  An easy example is an individual who wishes to pay a telephone bill online rather than with a paper check; the individual is an "originator" and money will be withdrawn from his or her bank account.  The individual's bank is an Originating Depository Financial Institution (ODFI).  On the other end await the payees, or receivers, as well as their banks, the Receiving Depository Financial Institutions (RDFIs).  In the middle of the originating and receiving parties is an ACH operator.  The ACH operator is operated by a private organization or a Federal Reserve Bank.

In this case, Greater Rome Bank had an agreement with the Federal Reserve Bank (the "Fed") for clearing and settling ACH items.  Banks can initiate their own credit and debit entries to the Fed, but they can also use the services of a third-party sender.  *See ACH Rules,* Dkt. 9-26, at 4 (defining "Third-Party Service Provider").  Greater Rome Bank entered into a third-party sender agreement with DPS, which allowed DPS to directly transmit credit and debit entries to the Fed.  *See id; ODFI/Third-Party Sender Agmt.,* Bankr. Dkt. 109-16.

Unlike checks, which are always debit instruments, ACH transactions may be either a credit or a debit entry.  ACH credit entries occur when an originator asks that its

---

[2] Basic facts related to ACH transactions are drawn from the *2008 ACR Rules: A Complete Guide to Rules & Regulations Governing the ACH Network*, Dkt. 9-26.

money move into a receiver's account.  In an ACH debit transaction, funds flow the other

way, meaning that funds are collected from a receiver's account and transferred to an

originator's account.

The advantage of using the ACH system for transferring money is that the

transactions are accumulated and made in one large batch, rather than each smaller

payment being handled separately.  Member banks, such as Greater Rome Bank, submit

numerous independent credit and debit transactions to the Fed.  The Fed executes the

instructions and then settles the net result of credit and debit entries to a reserve account

for the member banks.  If there are more funds in credit transactions than debit

transactions initiated through a particular bank, then funds from that bank's reserve

account at the Fed will be withdrawn.

**3.     The Scheme**

As noted above, it was assumed for purposes of Greater Rome Bank's summary

judgment motion that Payroll America misappropriated some of its clients' monies that

had been earmarked to pay its clients' future tax bills.  Payroll America thus found itself

in a perpetual game of catch-up, basically using newly collected monies to pay earlier

obligations.  The scheme would play out as follows:

(a)     *The ACH Credit Instruction.*  Payroll America would initiate two ACH

instructions (a debit and credit instruction) for the same amount – say $1.5 million each.

The $1.5 million credit instruction resulted in $1.5 million being deposited into one of

Payroll America's bank accounts.  *See Am. Opening Br.*, Dkt. 14, at 10.

(b)    *The ACH Debit Instruction.*  At the same time, Payroll America would initiate a $1.5 million debit instruction, which was supposed to result in a debit to another Payroll America account.  The debit instruction would fail, however, because Payroll America did not have sufficient funds in the account.  *Id.*

(c)    *The Cure Wire.*  Within a day, the Fed would notify Greater Rome Bank of the failed debit instruction.  Greater Rome Bank would charge back the $1.5 million to DPS's account and notify DPS.  DPS, in turn, would relay the information to Payroll America.  *See Duke Depo.*, Dkt. 109-7, at 42:23 to 44:23.  Payroll America would then wire $1.5 million into DPS's account.

## 4.    The Cure Wires

In this action, the trustee focuses on the cure wires.  He argues that each time Payroll America wired money to DPS after the failed ACH debit entries, Payroll America was actually repaying Greater Rome Bank for short-term loans. Additionally, the trustee attacks a separate, one-time $1.25 million transfer from Payroll America to DPS.  This transfer does not match up to a failed debit instruction.  Instead, after Payroll America had issued several failed debit instructions, Payroll America transferred $1.25 million into DPS's bank account at Greater Rome as a reserve against future failed debit instructions.  *See Am. Opening Br.*, Dkt. 14, at 10.

During the period November 24, 2008 to February 12, 2009, Payroll America transferred a total of $30,765,238.01 into DPS's account as part of the cure wires.  *See*

Bankr. Dkt. 106, at 15.  That figure, added to the $1.25 million, one-time reserve transfer,

means the trustee is seeking to recover around $32 million from Greater Rome Bank.

## STANDARD OF REVIEW

District courts review bankruptcy court decisions in the same manner as would the

Ninth Circuit.  *See In re George*, 177 F.3d 885, 887 (9th Cir. 1999). On appeal, a grant of

summary judgment is reviewed de novo.  *See, e.g., Danning v. Miller (In re Bullion*

*Reserve of N. Am.)*, 922 F.2d 544 (9th Cir. 1991).  The appellate court must therefore

determine, viewing the evidence in the light most favorable to the nonmoving party,

whether there are any genuine issues of material fact and whether the bankruptcy court

correctly applied the relevant substantive law.  *Id.*

## ANALYSIS

The Chapter 7 trustee, as a representative of Payroll America's bankruptcy estate,

has broad powers under the Bankruptcy Code to "avoid" fraudulent transfers of property

and then have the transferred property returned to the estate for the benefit of anyone who

has a valid claim against the debtor.  *See* 11 U.S.C. §§ 548, 550.  The purpose of

fraudulent transfer law is to protect creditors from last-minute diminutions of the debtor's

pool of assets. *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890, 892 (7th

Cir.1988).

In these situations, Bankruptcy Code sections 548 and 550 work together.  *See* 11

U.S.C. §§ 548, 550.  Under § 548, the trustee can avoid fraudulent transfers.  More

specifically, under § 548(a)(1)(A), which is the subsection the trustee relies on here, the

trustee may avoid property the debtor transferred to others, within two years before the bankruptcy filing, where the debtor had the actual intent to hinder, delay, or defraud a creditor.  Then, under § 550(a), the trustee may track down the person or entity with the property and get it back.  But the trustee cannot recover the transferred property from just anyone.  Rather, he must show that the person or entity targeted is (1) an "initial transferee"; (2) an entity for whose benefit the transfer was made; or (3) a subsequent transferee.  The trustee argues that Greater Rome Bank fits into any one of these three categories.  The bankruptcy court disagreed, as does this Court.

**1.      Initial Transferee**

First, regarding the "initial transferee" argument, the Ninth Circuit defines a "transferee" as one who "has dominion over the money or other asset, the right to put the money to one's own purposes . . . .  The inquiry focuses on whether an entity had the right to use the money however it wished."  *In re Incomnet, Inc.*, 463 F.3d 1064, 1069 (9th Cir. 2006) (internal citations omitted).

Here, Greater Rome Bank did not have dominion over the cure wire money that flowed into DPS's account. The bank was not entitled to use the money held in DPS's account for its own purposes and the trustee has not put forth any persuasive argument to the contrary.  Broadly speaking, the trustee advances two theories in his attempt to classify Greater Rome Bank as an initial transferee.  First, the trustee argues that Greater Rome Bank lent money to Payroll America.  Second, the trustee argues that DPS was Greater Rome Bank's general agent.

### A.     The Lender Theory

The trustee relies on *Lippi v. City Bank*, 955 F.2d 599, 611 (9th Cir. 1992) to support his argument that Greater Rome Bank lent money to Payroll America.  *See Am. Opening Br.*, Dkt. 14, at 20 (citing *Lippi*).  *Lippi,* however, does not look at an analogous set of facts and find that one party was indeed a lender. Rather, that case held only that when a borrower repays a lender, the lender exercises dominion over those funds.  Here, there is no loan agreement between Payroll America and Greater Rome Bank.  So it cannot be said that Payroll America was making loan repayments to Greater Rome Bank when it wired funds into DPS's bank account.

The trustee attempts to force Payroll America and Greater Rome Bank into a debtor/creditor relationship by arguing that when Payroll America's debit transactions failed, Greater Rome Bank effectively lent money to Payroll America to cover the failed transaction.  But this is not so.  When Payroll America's account did not have enough money to cover any given debit instruction, that amount would be charged back to DPS's bank account at Greater Rome.  It is undisputed that DPS's account always had sufficient funds to absorb the chargebacks.  *See, e.g., Trustee's Reply Brf.,* Dkt. 22, at 2 (arguing that "*the fact that DPS' "clearing account" never overdrafted* in no way disproves the existence of PAI's obligations to GRB.") (emphasis added).  Greater Rome cannot logically be seen as a lender to Payroll America under these facts.

The Seventh Circuit rejected a similar argument in *Bonded Financial Services v. European American Bank*, 838 F.2d 890 (7th Cir. 1988) (Easterbrook, J.) – a case the

Ninth Circuit has embraced.  *See, e.g., In re Incomnet*, 463 F.3d at 1071 (acknowledging that the Ninth Circuit has explicitly adopted the dominion test set out in *Bonded*).  In *Bonded*, the bankruptcy trustee was attempting to recover monies from a bank.  The debtor had sent a $200,000 check to a bank, payable to the bank's order, with a note directing the bank to "deposit this check into Mike [Ryan]'s account."  838 F.2d at 891.  The bank did this.  Ten days later, Ryan instructed the bank to debit the account $200,000 to reduce the outstanding balance on a loan he had with the bank.  *Id.*

The trustee urged the court to treat the bank as the initial transferee, which would ignore the fact that there were really two distinct steps in the financial transaction:  (1) the debtor put the money into Ryan's account; and (2) Ryan paid off his loan.  The Seventh Circuit refused to treat the bank as an initial transferee, explaining that "[t]he Bank had no dominion over the $200,000 until . . . Ryan instructed the Bank to debit the account to reduce the loan; in the interim [10 days], Ryan was free to invest the whole $200,000 in lottery tickets or uranium stocks."  *Id.* at 894.

Here, as in *Bonded,* the trustee cannot focus only on the ultimate, net effect of the transaction.  Rather, the cure wires must be tracked to see who had dominion of them and when.  Payroll America did not wire the cure monies to DPS with instructions to use these funds to pay Greater Rome Bank for some preexisting loan to Payroll America.  Rather, the funds went directly into DPS's account.

The trustee also cites various contractual provisions to shore up his argument that Greater Rome Bank lent money to Payroll America.  For example, the trustee points to

the indemnity provision in the service contract between Payroll America and DPS, which

says:

> [Payroll America] will indemnify and hold harmless . . . DPS's
> processing financial institution [Greater Rome Bank] from any and
> all claims, lawsuits, demands, damages, costs, or other expenses . . .
> in any way related to . . . (b) any act or omission of [Payroll America
> and its employees or agents] including fraudulent or incorrect
> transmission of data . . . .

*Nov. 14, 2008 Direct Deposit Services Agmt.*, Bankr. Dkt. 109-17 ¶ 10.  This provision,

just sitting there unexercised, does not mean the bank lent money to Payroll America, nor

does it mean that Greater Rome Bank had the right to control the money that flowed into

DPS's accounts via the cure wires.

　　　The trustee also points to this provision in the ACH Rules:

> Each Third-Party Sender is obligated to make payment to the ODFI
> for all credit entries and for all debit entries that are returned by the
> RDFI.

*ACH Rules,* Bankr. Dkt. 109-24, ¶ 3 at p. OG128.  But this just says that DPS (as a third-

party sender) must pay the ODFI for credit entries and returned debit entries.  *See*

*ODFI/Third-Party Sender Agreement*, Bankr. Dkt. 109-16, at 1 (defining DPS as a

"Third-Party Sender" where Greater Rome Bank agrees to act as an ODFI). The

agreement does not put Greater Rome Bank and Payroll America into a debtor/creditor

relationship.

　　　The trustee also points to the Third Party Sender Agreement between DPS and the

bank.  *See* Bankr. Dkt. 109-16.  That agreement obligates DPS to "promptly pay" Greater

Rome Bank for each returned debit entry.  *Id.* ¶ 11(b).  The agreement also permits

Greater Rome Bank to debit DPS's account to obtain payment "of any amount due and payable" to the bank under the agreement.  *Id.* ¶ 12.

Again, this agreement does not show that Greater Rome Bank lent money to Payroll America, nor does it show that Greater Rome Bank had dominion over the cure wires as they flowed into the account. Rather, similar to a bank that has the right to debit an account if a customer bounces a check, the bank simply had the right to debit DPS's account for returned debit entries, *i.e.,* the amounts "due and payable to it" under the Third Party Sender Agreement.  *See Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consolidated Pioneer Mortg. Entities)*, 166 F.3d 342, 1999 WL 23156, at *1 (9th Cir. 1999) (unpublished table decision) ("[w]hen the Bank allowed Pioneer to write checks from accounts with insufficient funds, and then make covering deposits, it was offering a service to a customer, rather than establishing a debtor-creditor relationship.").

In short, the bankruptcy court correctly determined that the trustee failed to demonstrate a triable issue of fact regarding whether Greater Rome Bank lent Payroll America money or had dominion over the cure wire monies Payroll America put into DPS's account.

### B.    The Agency Theory

The trustee next argues that DPS was an agent for Greater Rome Bank.  Under this theory, when Payroll America wired funds into DPS's account, DPS was simply an agent for the bank – meaning that DPS essentially drops out of the picture and that Greater

Rome Bank is the initial transferee.  The Ninth Circuit has held that "'When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded." *Bullion*, 922 F.2d at 548 (citing *Bonded*, 838 F.2d at 892.)

DPS, however, does not fit this model.  As already noted, Payroll America did not transfer the cure wire monies to DPS with instructions that DPS to turn over the monies to Greater Rome Bank.  Rather, when the money came into DPS's account, the bank did not have the unfettered right to access those monies for its own purposes.  The dominion inquiry thus ends.

That Greater Rome Bank may have exercised some other sorts of controls over DPS – in terms of, for example, auditing DPS or exercising some controls over DPS's allowable client base – does not create a triable issue of fact as to whether Greater Rome Bank had dominion over the cure wires.  As the bankruptcy court explained, the crucial issue is "control over the money" – not Greater Rome Bank's alleged control over DPS.  *See Hearing Transcript*, Dkt. 9-44, at 54 (discussing *In re Viola*, 469 B.R. 1 (9th Cir. BAP 2012)); *see also In re Incomnet, Inc.*, 463 F.3d 1064, 1069 (9th Cir. 2006) (the dominion inquiry focuses on whether an entity has the right to use the money however it wishes); *cf. In re Video Depot, Ltd.*, 127 F.3d 1195, 1199-1200 (9th Cir. 1997) (a principal of a corporation may have power to control the corporation's conduct and disburse its money, but this is not sufficient to give the principal "dominion" over the corporation's money).

Additionally, the written agreements the trustee cites do not show that DPS received the cure wires as an agent for the bank. Starting with the Third-Party Sender Agreement, that agreement states that third-party senders like DPS (among various others) "shall not be deemed . . . [Greater Rome Bank's] agent." *Third-Party Sender Agreement* ¶ 16(a) ("Financial Institution shall not be responsible for Third-Party Sender's acts or omissions . . . or those of any other person . . . and no such person shall be deemed Financial Institution's agent.").

Similarly, the deposit account agreement between Greater Rome Bank and DPS do not create an agency relationship. Rather, as the bank points out, that agreement reinforces the contractual debtor-creditor relationship between Greater Rome Bank and DPS. For all these reasons, there is no triable issue of fact as to whether Greater Rome Bank was an initial transferee of the cure wires.

**2.     The "Entity For Whose Benefit Such Transfer was Made"**

The trustee next argues that if Greater Rome Bank was not the initial transferee, it was the entity who benefitted from the cure wires. To support this argument, the trustee invokes the following phraseology from § 550(a)(1): "[T]he trustee may recover . . . the property transferred . . . . from . . . *the entity for whose benefit such transfer was made* . . . ." (emphasis added). As the Ninth Circuit has explained,

> "This phraseology implies a requirement that, in transferring the avoided funds, the debtor must have been motivated by an intent to benefit the individual or entity from whom the trustee seeks to recover. It is not enough that an entity benefit from the transfer; the transfer must have been *made for his benefit*."

*Bullion*, 922 F.2d at 547 (*quoting Merrill v. Dietz (In re Universal Clearing House Co.*),
62 B.R. 118, 128 n.12 (D. Utah 1986)).

The classic example of an "entity for whose benefit such transfer was made" is "a
guarantor or debtor – someone who receives the benefit but not the money." *Bonded*,
838 F.2d at 895. Section 550(a)(1) thus "recognizes that debtors often pay money to A
for the benefit of B; that B may indeed have arranged for the payment . . . ; that but for
the payment B may have had to make good on the guarantee or pay off his own debt; and
accordingly that B should be treated the same way initial recipients are treated." *Id.* at
896.

Greater Rome Bank does not fit this paradigm. The bank did not guarantee any
obligation nor had it borrowed money. Thus, when Payroll America transferred money
into DPS's account, these monies did not reduce or extinguish Greater Rome Bank's
financial obligations. Rather, as the bank points out, the monies were ultimately used to
pay taxes and employee payroll.

This is not to say that a for-benefit entity must always be a guarantor or a debtor.
But the trustee has not put forth any facts demonstrating that Greater Rome Bank should
be classified as a for-benefit entity. Rather, the trustee's only substantive argument on
appeal presumes that Greater Rome Bank lent Payroll America money. *See Appellant's
Am. Opening Br.*, Dkt. 14, at 18 ("In this case, PAI [Payroll America] made payments
into a DPS account to satisfy a debt it owed, directly, to GRB."). Thus, according to the
trustee, Greater Rome Bank was the entity that benefitted when Payroll America

transferred money into DPS's account. The Court is not persuaded by this argument for the reasons already explained; namely, there is no evidence that Greater Rome Bank lent money to Payroll America or that the cure wires were loan payments.

**3.      Subsequent Transferee**

The trustee next argues that Greater Rome Bank is a subsequent transferee of the cure wires.  To support this argument, the trustee explains that the sequencing of financial transactions looks like this:  (1) Payroll America wired cure monies to DPS who then (2) transferred those same monies to Greater Rome Bank.  As support, the trustee cites a DPS bank account statement, but that statement just shows, as an example, that the bank debited DPS's account for an even $1.5 million on December 5, 2008, the same day Payroll America wired a little over $1.5 million to the same account.  *Duke Dep., Ex. 12*, Dkt. 12-17, at GRB474, GRB482 ($1.5 million debited under an entry entitled "Template Standard TE Transfer"); *id.* at 112:23 to 113:6 (stipulation regarding the authenticity of Exhibit 12).  Witnesses at Greater Rome Bank and DPS explained that the chargeback to DPS's account (*i.e.,* the debit entry) occurred immediately; in other words, the bank did not wait for the wire transfer to hit DPS's account before debiting the account:

> [T]here's a chain there.  We got back to her [Duke, at DPS, after a debit ACH entry was returned ].  And our process always worked. *Returns, immediate debit.*  We get the report that agrees to the total we were charged at the Fed.  We charged her account, gave her the detail.  Then she has to run through the cycle to go back to her payroll companies who then have to go to the employers that failed to fund or unauthorized or whatever."

*Rule 30(b)(6) Dep.*, Dkt. 9-16, at 57:23 to 58:11 (emphasis added); *see also Winstead Dep.,* Dkt. 12-8, at 321:4-8 ("The debit that was going to hit her [DPS's] account would be on the bottom of that [returns] report . . . ."); *id.,* at 407:3-4; 408:21; *Duke Dep.*, Dkt. 9-9 at 42:23 to 43:8, 43:22 to 44:23; *Ex. 48, Mar. 10, 2009 Letter from Grey Winstead of Greater Rome Bank to Lori Duke*, Dkt. 9-30, at 1-2 (describing an appropriate timeline for chargebacks for clients that do not maintain adequate reserves). This testimony does not support the notion that Payroll America was transferring money to DPS, with DPS subsequently transferring those same monies to the bank.[3] Nor do they support the idea that Greater Rome Bank was lending money to Payroll America, who then repaid the loans with cure wires. Rather, the evidence shows that when one of DPS's clients had a return, DPS's account was debited.

In a somewhat similar case, involving a bank's relationship with a customer who would write checks and then later make covering deposits, the Ninth Circuit explained that "[w]hen the Bank allowed Pioneer to write checks from accounts with insufficient funds, and then make covering deposits, it was offering a service to a customer, rather

---

[3] Within this example – where a cure wire is made on December 5, 2008 – the trustee cites a "Return Items Report," dated December 4, 2008. *See Am. Opening Br.*, Dkt. 14, at 10 (citing *Depo. Ex. 59*, Dkt. 12-12, at 3). The trustee does not cite any testimony explaining more precisely when Greater Rome Bank received this report and forwarded it to DPS. *See id.* (stating only, without evidentiary citations, that "The report was received by GRB and forwarded to DPS."). Based on Greater Rome Bank's testimony, cited above, however, Greater Rome Bank debited DPS's account upon receipt of this report, without waiting for the corresponding cure wire to flow into DPS's account.

than establishing a debtor-creditor relationship." *In re Consolidated Pioneer Mortg. Entities,* 1999 WL 23156, at *1.

**4.      Greater Rome Bank's Alleged Bad Faith**

The trustee also says Greater Rome Bank cannot be viewed as a mere financial intermediary because it acted in bad faith.  In the Ninth Circuit, however, the focus is strictly on whether Greater Rome Bank had dominion over the funds.  It did not.  Thus, the trustee's insistence that Greater Rome Bank knew, or should have known, that Payroll America was operating a lapping scheme is not relevant.

The Ninth Circuit Bankruptcy Appellate Panel rejected a similar argument in *Hoskins v. Citigroup, Inc. (In re Viola)*, 469 B.R. 1 (9th Cir. BAP 2012).  In *Viola,* the debtor used a Citibank trust account to operate a Ponzi scheme.  *Id.* at 3.  A Citi branch vice president was  designated as a successor trustee on the account.  Moreover, Citi allegedly ignored multiple red flags and permitted glaring regulatory violations, thereby facilitating the continuation of the debtor's fraud.  *Id.* at 6.  Despite all this, the BAP focused tightly on who had dominion over the money, as Ninth Circuit authority dictates. Because none of the defendants had dominion over the trust account at any point, the BAP affirmed the bankruptcy court's dismissal of the trustee's fraudulent transfer claim. *Id.*  at 6-7.  The Court concurs with this analysis.

Finally, the Court will decline the trustee's invitation to disregard the Ninth Circuit's strict "dominion" test in favor of more lenient tests applied in other jurisdictions.

## CONCLUSION

The bankruptcy court's grant of summary judgment in favor of Greater Rome

Bank is **AFFIRMED.**

DATED: August 27, 2013

B. Lynn Winmill
Chief Judge
United States District Court